# Exhibit A

**COVER SHEET FOR FILING CIVIL ACTIONS**
COMMONWEALTH OF VIRGINIA

Case No. CL19005603-00
(CLERK'S OFFICE USE ONLY)

............................................................ RADFORD ........................................................................... Circuit Court

Kollmorgen Corporation ........................ v./In re: .... MICHAEL A. CAVALIERI, NOVANTA, INC.
PLAINTIFF(S)                                                            DEFENDANT(S)

.................................................................................... CELERA MOTION, A NOVANTA, INC. COMPANY

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**
**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
    [ ] Monetary Damages
    [ ] No Monetary Damages
[ ] Counterclaim
    [ ] Monetary Damages
    [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court
**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[X] Contract Action
[X] Contract Specific Performance
[ ] Detinue
[ ] Garnishment
**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
    [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights
**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[X] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[ ] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of
    (select one)
    [ ] ABC Board
    [ ] Board of Zoning
    [ ] Compensation Board
    [ ] DMV License Suspension
    [ ] Employee Grievance Decision
    [ ] Employment Commission
    [ ] Local Government
    [ ] Marine Resources Commission
    [ ] School Board
    [ ] Voter Registration
    [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
    [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
    [ ] Annulment – Counterclaim/Responsive
    Pleading
[ ] Child Abuse and Neglect – Unfounded
    Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
    [ ] Complaint – Contested*
    [ ] Complaint – Uncontested*
    [ ] Counterclaim/Responsive Pleading
    [ ] Reinstatement –
        Custody/Visitation/Support/Equitable
        Distribution
[ ] Separate Maintenance
    [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
    [ ] Guardian/Conservator
    [ ] Standby Guardian/Conservator
    [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
    [ ] Impress/Declare/Create
    [ ] Reformation
[ ] Will (select one)
    [ ] Construe
    [ ] Contested

**MISCELLANEOUS**
[ ] Amend Death Certificate
[ ] Appointment (select one)
    [ ] Church Trustee
    [ ] Conservator of Peace
    [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured
    Settlement
[ ] Bond Forfeiture Appeal
[X] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
    [ ] Reinstatement pursuant to § 46.2-427
    [ ] Restoration – Habitual Offender or 3rd
        Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[X] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
    [ ] Correct Erroneous State/Local
    [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

[X] Damages in the amount of $ 450,000.00 ......................... are claimed.

03/05/2019
DATE

Joshua R. Treece, Esq.
PRINT NAME

[ ] PLAINTIFF   [ ] DEFENDANT   [X] ATTORNEY FOR   [X] PLAINTIFF
    [ ] DEFENDANT

Woods Rogers, PLC; 10 S. Jefferson St., Ste. 1400
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

Roanoke, VA 24011; 540-983-7730

jtreece@woodsrogers.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

## Civil Action Type Codes
### (Clerk's Office Use Only)

Accounting ........................................................ ACCT
Adoption ........................................................... ADOP
Adoption – Foreign ............................................ FORA
Adult Protection ................................................ PROT
Aid and Guidance .............................................. AID
Amend Death Certificate .................................... ADC
Annexation ........................................................ ANEX
Annulment ........................................................ ANUL
Annulment – Counterclaim/Responsive Pleading .. ACRP
Appeal/Judicial Review
    ABC Board ................................................... ABC
    Board of Zoning .......................................... ZONE
    Compensation Board .................................... ACOM
    DMV License Suspension ............................. JR
    Employment Commission .............................. EMP
    Employment Grievance Decision .................. GRV
    Local Government ........................................ GOVT
    Marine Resources ........................................ MAR
    School Board ............................................... JR
    Voter Registration ....................................... AVOT
    Other Administrative Appeal ........................ AAPL
Appointment
    Conservator of Peace ................................... COP
    Church Trustee ............................................ AOCT
    Custodian/Successor Custodian (UTMA) ...... UTMA
    Guardian/Conservator .................................. APPT
    Marriage Celebrant ..................................... ROMC
    Standby Guardian/Conservator ..................... STND
Approval of Transfer of Structured Settlement ..... SS
Asbestos Litigation ............................................ AL
Attachment ........................................................ ATT
Bond Forfeiture Appeal ...................................... BFA
Child Abuse and Neglect – Unfounded Complaint .. CAN
Civil Contempt .................................................. CCON
Claim Impleading Third Party Defendant –
    Monetary Damages/No Monetary Damages .......... CTP
Complaint – (Miscellaneous) .............................. COM
Compromise Settlement ...................................... COMP
Condemnation .................................................... COND
Confessed Judgment ........................................... CJ
Contract Action ................................................. CNTR
Contract Specific Performance ........................... PERF
Counterclaim – Monetary Damages/No Monetary
    Damages ...................................................... CC
Cross Claim ...................................................... CROS
Declaratory Judgment ........................................ DECL
Declare Death .................................................... DDTH
Detinue ............................................................. DET
Divorce
    Complaint – Contested/Uncontested ............ DIV
    Counterclaim/Responsive Pleading .............. DCRP
    Reinstatement – Custody/Visitation/Support/
        Equitable Distribution ............................ CVS
Driving Privileges
    Reinstatement pursuant to § 46.2-427 ........... DRIV
    Restoration – Habitual Offender or
    3rd Offense ................................................. REST

Ejectment .......................................................... EJET
Encumber/Sell Real Estate .................................. RE
Enforce Vendor's Lien ....................................... VEND
Escheatment ...................................................... ESC
Establish Boundaries .......................................... ESTB
Expungement ..................................................... XPUN
Forfeiture of Property or Money ......................... FORF
Freedom of Information ...................................... FOI
Garnishment ...................................................... GARN
Injunction ......................................................... INJ
Intentional Tort ................................................. ITOR
Interdiction ....................................................... INTD
Interpleader ....................................................... INTP
Interrogatory ..................................................... INTR
Judgment Lien – Bill to Enforce ......................... LIEN
Landlord/Tenant ................................................ LT
Law Enforcement/Public Official Petition ............. LEP
Mechanics Lien ................................................. MECH
Medical Malpractice .......................................... MED
Motor Vehicle Tort ............................................ MV
Name Change .................................................... NC
Other General Tort Liability ............................... GTOR
Partition ............................................................ PART
Permit, Unconstitutional Grant/Denial by Locality LUC
Petition – (Miscellaneous) .................................. PET
Product Liability ................................................ PROD
Quiet Title ........................................................ QT
Referendum Elections ........................................ ELEC
Reinstatement (Other than divorce or driving
    privileges) .................................................. REIN
Removal of Case to Federal Court ...................... REM
Restore Firearms Rights – Review ...................... RFRF
Restore Firearms Rights – Review ...................... RFRR
Separate Maintenance ........................................ SEP
Separate Maintenance – Counterclaim/Responsive
    Pleading ..................................................... SCRP
Sever Order ....................................................... SEVR
Sex Change ....................................................... COS
Taxes
    Correct Erroneous State/Local .................... CTAX
    Delinquent .................................................. DTAX
Termination of Mineral Rights ........................... MIN
Trust – Impress/Declare/Create .......................... TRST
Trust – Reformation ........................................... REFT
Uniform Foreign Country Money Judgments ....... RFCJ
Unlawful Detainer ............................................. UD
Vehicle Confiscation .......................................... VEH
Voting Rights – Restoration ............................... VOTE
Will Construction .............................................. CNST
Will Contested .................................................. WILL
Writs
    Certiorari ................................................... WC
    Habeas Corpus ........................................... WHC
    Mandamus .................................................. WM
    Prohibition ................................................. WP
    Quo Warranto ............................................. WQW
Wrongful Death ................................................. WD

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF RADFORD

| | |
|---|---|
| **KOLLMORGEN CORPORATION,** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| **v.** ) | No. CL19 0005603-00 |
| ) | |
| **MICHAEL A. CAVALIERI,** ) | **JURY TRIAL DEMANDED** |
| ) | |
| **Serve:** ) | |
| **407 Heartwood Crossing** ) | |
| **Blacksburg, VA 24060,** ) | |
| ) | |
| **NOVANTA, INC.,** ) | |
| ) | |
| **Serve: Secretary of the Commonwealth** ) | |
|     **1111 East Broad Street** ) | |
|     **4th Floor** ) | |
|     **Richmond, Virginia 23219** ) | |
| ) | |
| **And** ) | |
| ) | |
| **CELERA MOTION, A NOVANTA,** ) | |
| **INC. COMPANY,** ) | |
| ) | |
| **Serve: Secretary of the Commonwealth** ) | |
|     **1111 East Broad Street** ) | |
|     **4th Floor** ) | |
|     **Richmond, Virginia 23219** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff Kollmorgen Corporation ("Kollmorgen"), for its Complaint against Defendants

Michael A. Cavalieri ("Cavalieri"), Novanta, Inc. ("Novanta"), and Celera Motion, a Novanta, Inc.

Company ("Celera") (collectively, "Defendants"), alleges as follows:

## PARTIES

1.     Kollmorgen is a New York corporation with its principal place of business in Radford, Virginia.  Kollmorgen is a leading provider of motion control systems and components for customers and equipment manufacturers around the globe.  Kollmorgen has a global design and manufacturing facility located in Radford, Virginia.

2.     Cavalieri is the former Senior Director of Operations for Kollmorgen - North America and worked at Kollmorgen's global design and manufacturing facility in Radford, Virginia.  Until January 4, 2019, Cavalieri worked as the Senior Director of Operations in the Global Operations Department and as a member of the Kollmorgen North America Leadership Team.  Until at least February 2019, Cavalieri was a resident of Blacksburg, Virginia.  Since at least February 2019, Cavalieri has been employed as the Vice President of Operations for Celera, a Novanta company, and a direct competitor of Kollmorgen, in breach of his contractual and legal duties to Kollmorgen.

3.     Novanta is a Delaware corporation with its principal place of business in Massachusetts.  Celera is Novanta's motion control business with its World Headquarters, North American Sales Office and Customer Service and Technical Support Office in Bedford, Massachusetts.  Celera and Novanta are direct competitors of Kollmorgen's motion control business.  Since at least February 2019, Celera and Novanta have been aware that Cavalieri's employment with and responsibilities at Celera and Novanta breach Cavalieri's contractual and legal duties to Kollmorgen, but Celera and Novanta have nonetheless continued to employ Cavalieri in a capacity that tortiously interferes with Kollmorgen's contractual agreements with Cavalieri.

## JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over Cavalieri because, at times relevant hereto, Cavalieri was a resident of Virginia, Cavalieri contracted with and was employed by Kollmorgen in Virginia, Cavalieri signed a Fortive Corporation and Its Affiliated Entities Agreement Regarding Competition and Protection of Proprietary Interests Agreement ("Restrictive Covenants & Non-Disclosure Agreement" or "RCNDA") in Virginia, Cavalieri has transacted business in Virginia, and Cavalieri has caused the harm complained of to Kollmorgen in Virginia through acts and omissions occurring both inside and outside Virginia. This Court also has personal jurisdiction over Cavalieri because he signed a Separation Agreement and General Release of claims against Kollmorgen, its affiliates and related persons and entities ("Separation Agreement") in Virginia on January 5, 2019 wherein he reaffirmed his continuing obligations under the Restrictive Covenant & Non-Disclosure Agreement and agreed to other obligations therein. Further, pursuant to Section 17 of the Separation Agreement, Cavalieri "irrevocably submit[ted] to and recognize[d] the jurisdiction of [Virginia] courts" and "agree[d] that [Virginia] courts are the only courts of competent jurisdiction."

5.      This Court has personal jurisdiction over Novanta and Celera under Virginia Code § 8.01-328.1 because, among other things, these defendants hired and employed Cavalieri when he was located in Virginia and a resident of Virginia, these defendants have transacted business in Virginia, these defendants have caused tortious injury to Kollmorgen in Virginia through acts and omissions occurring both inside and outside Virginia, and, on information and belief, these defendants regularly conduct or solicit business, or engage in persistent conduct or derive substantial revenue from goods used or consumed or services rendered, in Virginia.

6.      Venue is proper in this Court under Virginia Code § 8.01-262(4) because the cause of action or a part thereof arose in Radford, Virginia.

## NATURE OF THE ACTION

7.     This action arises out of:  (i) Cavalieri's breaches of his contractual duties owed to Kollmorgen under his Restrictive Covenants & Non-Disclosure Agreement or RCNDA (Count 1); (ii) Cavalieri's material breaches of his contractual duties owed to Kollmorgen under his Separation Agreement (Count 2); (iii) Kollmorgen's request for a declaratory judgment under Virginia Code §§ 8.01-184, et seq. declaring (a) that Cavalieri materially breached his obligations to Kollmorgen under the Separation Agreement, and (b) that Kollmorgen is not obligated to pay severance to Cavalieri and is entitled to recoup amounts previously paid to Cavalieri under the Separation Agreement unless and until he fully and materially complies with his obligations under the Separation Agreement (Count 3); (iv) Cavalieri's actual and/or threatened misappropriation of Kollmorgen's trade secrets protected under Virginia Code §§ 59.1-336, et seq. (Count 4); (v) Novanta's and Celera's tortious interference with the RCNDA (Count 5); and (vi) specific performance requiring Cavalieri to disclose Developments (as defined in Section 3 of the RCNDA) that were solely or jointly conceived by Cavalieri during the six month period beginning January 5, 2019 (including his employment with Novanta and Celera) that are required to be disclosed to Kollmorgen pursuant to Section 4 of the RCNDA (Count 6).

8.     Kollmorgen seeks temporary and permanent injunctive relief and monetary damages against Defendants to prevent and compensate for actual and threatened injury to Kollmorgen in its business, trade and reputation arising from these breaches of contract, actual and/or threatened misappropriation of trade secrets, and tortious interference.

9.     Kollmorgen also seeks a declaration, pursuant to Virginia Code §§ 8.01-184, et seq., that Cavalieri materially breached his obligations to Kollmorgen under the Separation Agreement such that Kollmorgen is not obligated to pay severance and is entitled to recover

amounts previously paid to Cavalieri.  Kollmorgen also seeks specific performance of Sections 3 and 4 of the RCNDA requiring the disclosure of all Developments solely or jointly conceived by Cavalieri during the six months following his employment with Kollmorgen.  Kollmorgen further seeks an award of punitive damages against Novanta and Celera for their continuing and willful tortious conduct.

## FACTUAL ALLEGATIONS

### Kollmorgen's Confidential Information & Trade Secrets

10.     For approximately sixty years, Kollmorgen has been engaged in highly-competitive and specialized motion control design and development with hundreds of motion-related patents. As an industry leader, Kollmorgen not only offers thousands of commercial, off-the-shelf (COTs) products, Kollmorgen also designs and develops customized and clean-sheet motors and products, and provides related engineering and support services.

11.     Among its product offerings, Kollmorgen focuses on providing competitive and proprietary innovation with customized and COTS frameless, brushless, servo and torquer motors and related products and services for various specialized industries including the Aerospace & Defense, Robotics and Medical Device industries.

12.     Kollmorgen, through extensive efforts and the expenditures of substantial amounts of time and money over many years, has developed commercially valuable confidential, proprietary and trade secret information including, but not limited to:  proprietary and trade secret motor designs and engineering solutions; product improvements and strategies; service improvements and strategies; customer and supplier data, reports, and information (including customer agreements, customer lists, contract terms, customer buying practices, etc.); business methods; supply chain; quality control methods; customer prospects, proposals and work in

progress; current and prospective product applications; marketing and sales plans; technical processes and techniques; technical information, know-how and research and development; formulae; inventions and invention disclosures; discoveries; drawings; invention methods and systems; prototypes and models; business plans, projections, prospects, opportunities and strategies; competitive analyses; product costs; manufacturing costs; pricing information; business forecast information; financial information and plans (including, but not limited to, those related to revenue, cost and profit associated with products and services); software, source code and object code; management information; and plans or proposals related to the foregoing; and other confidential and proprietary or trade secret information which would cause competitive harm to Kollmorgen if misappropriated, misused or disclosed, without authorization, by others ("Kollmorgen Confidential Information").

13.     This Kollmorgen Confidential Information is a valuable commercial asset of Kollmorgen, and Kollmorgen has guarded the secrecy of this Kollmorgen Confidential Information from disclosure to competitors or other persons and entities outside of Kollmorgen. Kollmorgen derives independent economic value from this Kollmorgen Confidential Information not being generally known or readily ascertainable by other persons or entities, and at all times Kollmorgen has engaged in reasonable efforts to maintain its secrecy.

### Cavalieri was Employed by Kollmorgen & Entered into the Restrictive Covenants & Non-Disclosure Obligations

14.     Cavalieri worked for Kollmorgen and its affiliates for nearly 15 years, from June 2004 until January 4, 2019.  A copy of Cavalieri's  LinkedIn page with his work history is attached hereto as **Exhibit 1**.

15.    In the 24 months preceding his departure from Kollmorgen, Cavalieri was the Director of Operations for Kollmorgen's Custom Business Unit and Senior Director of Operations for Kollmorgen-North America.

16.    At the time of his departure, Cavalieri was the Senior Director of Operations in the Global Operations Department and a member of the Kollmorgen North America Leadership Team, with responsibility for Kollmorgen's competitive operations in North America.   A copy of Cavalieri's Director of Operations job description is attached hereto as **Exhibit 2**.

17.    On January 5, 2018, Cavalieri and Kollmorgen executed and entered into the Restrictive Covenants & Non-Disclosure Agreement or RCNDA attached hereto as **Exhibit 3**. Kollmorgen was an affiliate of Fortive Corporation ("Fortive") when Cavalieri executed the RCNDA.

18.    Pursuant to Section 1(b) of the RCNDA, Cavalieri agreed he would not, without Kollmorgen's prior written permission, **directly or indirectly use or disclose to anyone outside Kollmorgen, any Kollmorgen Confidential Information** as long as such matters remain trade secrets or confidential information.

19.    Pursuant to Section 3 of the RCNDA, Cavalieri assigned to Kollmorgen his entire right, title and interest in any idea, formula, invention, discovery, design drawing, process, method, technique, device, improvement, computer program and related documentation, technical and non-technical data, work of authorship, trade secret, copyright, trademark, service mark, trademark registration, application for trademark registration, and patent and patent applications ("Developments"), which he may solely or jointly conceive, write or acquire in whole or in part during his employment for Kollmorgen, and **for a period of six months thereafter**, and which relate in any way to the actual or anticipated business or research or development of Kollmorgen.

20.     Pursuant to Section 4 of the RCNDA, Cavalieri agreed to **promptly disclose any and all Developments to Kollmorgen**, including those Developments he may solely or jointly conceive, write or acquire in whole or in part **for a period of six months after his employment with Kollmorgen**.   This would include Developments, as defined in Section 3, that were conceived, written or acquired since Cavalieri has been employed with defendants Novanta and Celera, which have not yet been disclosed to Kollmorgen, and will not be disclosed to Kollmorgen, in breach of Cavalieri's duties to Kollmorgen, without a Court Order compelling such disclosure.

21.     Pursuant to Section 6 of the RCNDA, Cavalieri agreed that **for a period of 12 months** following his employment with Kollmorgen, that he will not, among other things:

(a)     **directly or indirectly solicit** any person, company or entity to purchase or contract for **products or services competitive with products or services offered by, developed by, designed by or distributed by Kollmorgen**, if that person, company or entity was a customer or potential customer of Kollmorgen for such products or services with which he had direct contact or about which he learned Confidential Information related to such products or services at any time during the 24 months preceding the termination of his employment with Kollmorgen;

(b)     **directly or indirectly offer products or services competitive with products or services offered by, developed by, designed by or distributed by Kollmorgen** to any person, company or entity which was a customer or potential customer of Kollmorgen for such products or services and with which he had direct contact regarding such products or services at any time during the 24 months preceding the termination of his employment with Kollmorgen;

(c)     **directly or indirectly operate or participate in the operations of any company in competition with Kollmorgen** (including, for example, serving as Celera's Vice President of Operations) or **be employed by any company in competition with Kollmorgen with**

which he holds a position similar to his Director of Operations position at Kollmorgen (including, for example, serving as Celera's Vice President of Operations) in North America (the geographic territory for which Cavalieri was responsible during the 24 months prior to his termination from Kollmorgen);

...

(e) **directly or indirectly use or reveal confidential contract or relationship terms** with any vendor or customer used by or served by Kollmorgen at any time during the 24 months preceding the termination of his employment with Kollmorgen; and

...

(g) **directly or indirectly participate in the planning, research or development** of any products or services, competitive with products or services of Kollmorgen, excluding general industry knowledge, for which he had product or service planning, research or development responsibilities during the 24 months preceding the termination of his employment with Kollmorgen.

22.     Pursuant to Section 8 of the RCNDA, Cavalieri agreed that, for a period of five (5) years after his employment with Kollmorgen ended, he will affirmatively provide the RCNDA to all subsequent employers, which would include Novanta and Celera.

23.     Pursuant to Section 9 of the RCNDA, Cavalieri agreed that:

(a)     in the event of a breach or a threatened breach of the RCNDA, Kollmorgen will face irreparable injury for which damages would be an inadequate remedy, and he agreed Kollmorgen "shall be entitled, in addition to remedies otherwise available at law or in equity, to obtain and enforce immediately temporary restraining orders, preliminary injunctions and final injunctions without the posting of a bond enjoining such breach or threatened breach"; and

(b)     if Kollmorgen successfully enforces any portion of the RCNDA Kollmorgen shall be entitled to receive and recover from him all of its reasonable attorney's fees, litigation expenses and costs incurred as a result of enforcing the RCNDA.

### Cavalieri was Provided Access to Kollmorgen Confidential Information

24.     As Director of Operations and Senior Director of Operations for Kollmorgen in the last 24 months of his employment, Cavalieri was responsible for, among other things, operations and strategic planning; executing an operational strategy; managing the operations team to fulfill internal and external customer demand; working closely with sales and marketing to support customer demand; and working closely with product design and marketing to support product development initiatives. *See generally* Exhibit 2. Cavalieri directly interacted with Kollmorgen customers and had visibility into Kollmorgen's entire customer base and vendor and supplier base.

25.     As both Director of Operations and Senior Director of Operations and as a member of the North American Leadership Team, Cavalieri was intimately familiar with and given access to some of Kollmorgen's most confidential, proprietary and trade secret information. He was directly involved in and given access to Kollmorgen's 2017 North American and global Strategic Plan and strategic initiatives that contain the most sensitive competitive, strategic and financial information that allows Kollmorgen to effectively compete in highly specialized and competitive industries, including the Aerospace & Defense, Robotics and Medical Device industries. Cavalieri was likewise familiar with and given access to the same types of information in Kollmorgen's 2018 North American and global Strategic Plan and expansion initiatives.

26.     Both the 2017 and 2018 Strategic Plans identify Novanta/Celera, and their Applimotion brand of products, as direct competitors of Kollmorgen and contain highly confidential information and trade secrets related to competition with and planned expansion into areas in which Novanta/Celera directly compete with Kollmorgen.

27.     Cavalieri is intimately familiar with Kollmorgen's frameless, brushless motors and all manner of confidential information and trade secrets related thereto.  Cavalieri was likewise familiar with Kollmorgen's new generation of frameless, brushless motors that target the Robotics and other markets in which Novanta and Celera compete.

28.     Kollmorgen's frameless, brushless motors compete with other frameless motors offered by competitors, such as Novanta/Celera, in the Aerospace & Defense, Robotics and Medical Device industries.

29.     Over the course of his entire employment with Kollmorgen, Kollmorgen trained Cavalieri, disclosed Kollmorgen Confidential Information to Cavalieri and entrusted him with this Kollmorgen Confidential Information.  Cavalieri understood that the misuse or unauthorized disclosure of this Kollmorgen Confidential Information would be detrimental to Kollmorgen and that Kollmorgen would suffer great loss and damage if Cavalieri should, on his own behalf or on behalf of any other person or entity (such as Novanta/Celera), misuse or disclose, without authorization, any of this Kollmorgen Confidential Information.

### Cavalieri Reaffirms His Obligations in the RCNDA and Further Agreed to Protect Kollmorgen Confidential Information in Exchange for Separation Payments

30.     Cavalieri was separated from Kollmorgen on January 4, 2019, and executed the Separation Agreement on January 5, 2019, a copy of which is attached hereto as **Exhibit 4**.

31.     In exchange for his agreement to reaffirm his obligations in the RCNDA and his agreement to comply with additional non-disclosure and restrictive covenant obligations set forth in the Separation Agreement, all of which were material and essential to the Separation Agreement, Kollmorgen agreed to provide substantial payments to Cavalieri to which he was not otherwise entitled.

32.     Cavalieri further agreed that if he were to breach the restrictive covenants in the Separation Agreement, including those set forth in the RCNDA and incorporated in the Separation Agreement, Kollmorgen would be "irreparably harmed as a matter of law and will be entitled to seek immediate injunctive relief, plus its reasonable attorneys' fees incurred in enforcing the provision breached."

33.     Prior to confirming his breaches of the RCNDA and Separation Agreement in January 2019, Kollmorgen paid Cavalieri amounts under the Separation Agreement to which he was not otherwise entitled, including the ICP Bonus.

### Cavalieri Breaches the RCNDA & Separation Agreement

34.     Kollmorgen trusted that Cavalieri would honor his representations and assurances and comply with the RCNDA and the Separation Agreement.   Kollmorgen's trust was sorely misplaced.

35.     Contrary to his representations and obligations, Cavalieri applied for the Vice President of Operations position at Celera.  This is a position with responsibilities nearly identical to his Director of Operations positions a Kollmorgen, and is a management and operations position with a direct competitor of Kollmorgen.  Cavalieri's employment in this position is in direct violation of Sections 6(c) and 6(g) of the RCNDA and Section 5(a) of the Separation Agreement.

36.     Cavalieri applied for this position in or before January 2019 and, on information and belief, his employment with Celera began on or before January 30, 2019.

37.     As set forth in the Novanta's job posting for the Celera Vice President of Operations, a copy of which is attached hereto as **Exhibit 5**, Cavalieri is responsible for, among other things, "leading [Celera's] strategic thinking and tactical implementation regarding all aspects of multi-site operations to include supply chain, planning, quality, manufacturing,

assembly, test engineering, [etc.]." Ex. 5 at 1.  In this position, Cavalieri "[d]evelop[s] and manage[s] [the] operational team and oversee all manufacturing activities." *Id.* at 2.  He provides "day to day support to sales and engineering," "[d]rive[s] the new product innovation process through manufacturing according to business needs and strategic plan," and "[a]cts as a key member of executive management team balancing strategy and detailed tactics." *Id.* at 2-3.

38.     On information and belief, Cavalieri is supporting Celera, directly and/or indirectly, in its current efforts to solicit, offer, sell and actively compete for Kollmorgen customers and prospective customers in North America, including, but not limited to: ASML, Pacific Antenna Systems, and others that will be identified following entry of an appropriate protective order. Cavalieri had direct contact with these customers and/or learned/knew Kollmorgen Confidential Information related to the products and services provided to these customers within the last 24 months of his employment.  This conduct is in violation of Sections 6(a), (b) and/or (e) of the RCNDA and Section 5(a) of the Separation Agreement.

39.     Celera, through its Applimotion brand of frameless motors, among other products and services, has and continues to generally compete with Kollmorgen in the Aerospace & Defense, Robotics and Medical Device industries, including with Kollmorgen customers and potential customers in North America such as:  Northrup Grumman Remotec, L-3 Daytron, CPI Malibu, Aerovironment, ASML, Tecnar, IJK Controls, Pacific Antenna Systems and others that will be identified following entry of an appropriate protective order. Cavalieri had direct contact with these customers and/or learned/knew Kollmorgen Confidential Information related to the products and services provided to some or all of these customers within the last 24 months of his employment.

40.     Cavalieri's Vice President of Operations position at Celera and Cavalieri's competition with Kollmorgen in this position strikes at the very heart of the restrictive covenants. Indeed, the Vice President of Operations position is the quintessential example of the unfair competition that Kollmorgen sought to prevent with the RCNDA and Separation Agreement.

41.     At all times since his execution of the RCNDA on January 5, 2018, Cavalieri has been aware of the existence and terms of the RCNDA and the necessity of his compliance with and performance of the RCNDA to protect Kollmorgen's legitimate business interests. Cavalieri even reaffirmed these obligations and similar obligations in the Separation Agreement he signed on January 5, 2019.

42.     By letter dated February 4, 2019, Kollmorgen again reminded Cavalieri of his obligations under the RCNDA and Separation Agreement, informed him that he was in breach of those obligations, demanded that he cease and desist from continuing to breach his obligations, and again instructed him to provide Novanta and Celera with a copy of the RCNDA.

43.     In its February 4, 2019 letter, Kollmorgen further stated that "[u]ntil such time as we receive information from you that satisfies Kollmorgen that all of your contractual obligations to Kollmorgen have been met, we consider you to be in breach of contract and will continue to withhold from you the payments and benefits outlined in the Separation Agreement."

44.     Despite being keenly aware of his obligations, Cavalieri has intentionally, willfully and materially breached his RCNDA and Separation Agreement with Kollmorgen and has refused to cease and desist from his wrongful conduct.

### Novanta's & Celera's Tortious Interference with the RCNDA

45.     Under the terms of the RCNDA, Cavalieri had an obligation to provide a copy of the RCNDA to Novanta and Celera.

46.     On information and belief, Cavalieri provided Novanta and Celera with a copy of the RCNDA on or before January 30, 2019.

47.     On or about February 4, 2019, Kollmorgen sent a letter to Novanta and Celera informing them of Cavalieri's obligations under the RCNDA and of Cavalieri's "breache[s of his] contractual obligations by accepting employment with Novanta or a subsidiary of Novanta." Kollmorgen further informed Novanta and Celera that Cavalieri had "access to virtually all of Kollmorgen's confidential information and trade secrets," and Kollmorgen did not expect that Cavalieri would be able to honor his nondisclosure obligations to Kollmorgen in his capacity as Vice President of Operations for Novanta/Celera.

48.     Kollmorgen also informed Novanta and Celera that if Cavalieri continued to breach his RCNDA and other agreements, Kollmorgen was prepared to pursue any and all legal remedies available.

49.     Since receiving notice of Cavalieri's violations of his agreements and his wrongful competition, Novanta and Celera have refused to remove Cavalieri as the Vice President of Operations and take all necessary steps to ensure that Cavalieri is not violating his agreement with Kollmorgen.  Instead, Novanta and Celera have intentionally, willfully and tortiously interfered with Kollmorgen's RCNDA with Cavalieri and enabled Cavalieri to continue to breach his agreements with Kollmorgen.

50.     As set forth above, Cavalieri possesses extensive and intimate knowledge of Kollmorgen's trade secrets, and he cannot effectively perform his duties at Celera without disclosing, using or relying on Kollmorgen's trade secrets.  Based on the circumstances to date, and Novanta's and Celera's refusal to remove Cavalieri as the Vice President of Operations and take all necessary steps to ensure that Cavalieri is not violating his agreement with Kollmorgen, it

is clear that Novanta and Celera are unable or unwilling to adequately safeguard Kollmorgen's trade secrets and they cannot be adequately protected by Cavalieri in his position as Vice President of Operations. Kollmorgen, therefore, is entitled to an injunction to prohibit this actual or threatened misappropriation as set forth in Virginia Code § 59.1-337, and damages for any and all actual misappropriation as set forth Virginia Code §§ 59.1-338, et seq. *See MeadWestvaco Corp. v. Bates*, 91 Va. Cir. 509, 525 (Cir. Ct. 2013).

### Defendants' Actions Have Caused Great Harm to Kollmorgen's Business

51.     Beginning in January 2019 and no later than February 4, 2019, and at all times continuing up to the present, Defendants have injured Kollmorgen by, among other things, breaching and tortiously interfering with the RCNDA and/or Separation Agreement, and engaging in actual and/or threatened misappropriation of Kollmorgen's trade secrets.

52.     By engaging in this and other similar conduct, Cavalieri has breached the RCNDA (Count 1) and has caused great damage to Kollmorgen.

53.     By engaging in this and other similar conduct, Cavalieri has breached the Separation Agreement (Count 2) and has caused great damage to Kollmorgen.

54.     By engaging in this and other similar conduct, Cavalieri has materially breached the Separation Agreement and is not entitled to any payments or benefits thereunder until he fully and materially complies with his obligations (Count 3).

55.     By engaging in this and other similar conduct, Cavalieri has engaged in actual and/or threatened misappropriation of Kollmorgen's trade secrets (Count 4) and has caused and/or will cause great damage to Kollmorgen.

56.     By engaging in this and other similar conduct, Novanta and Celera have tortiously interfered with the RCNDA (Count 5), and has caused great damage to Kollmorgen.

57.    Cavalieri cannot effectively perform his duties at Celera without disclosing, using or relying on Kollmorgen's trade secrets. Therefore, on information and belief, Cavalieri, while employed by Novanta/Celera, has solely or jointly conceived of Developments (as defined in Section 3 of the RCNDA) to which all right, title and interest has been assigned to Kollmorgen. Cavalieri, however, has not yet disclosed those Developments to Kollmorgen, and will not disclose those Developments to Kollmorgen, in breach of Cavalieri's duties to Kollmorgen, without a Court Order compelling such disclosure. Cavalieri's failure to disclose Developments to Kollmorgen in the six months following his departure from Kollmorgen will cause substantial damage to Kollmorgen and deprive it of property rights to which it is entitled. Kollmorgen, therefore, is entitled to specific performance requiring Cavalieri to disclose those Developments that were solely or jointly conceived by Cavalieri during the six month period beginning January 5, 2019 that are required to be disclosed to Kollmorgen pursuant to Section 4 of the RCNDA (Count 6).

58.    Defendants' actions, both individually and collectively, have proximately caused and will continue to proximately cause Kollmorgen to suffer immediate and irreparable harm, unless Defendants are temporarily and permanently enjoined to honor the agreements with and their legal obligations to Kollmorgen.

59.    Kollmorgen has no adequate remedy at law. Without temporary and permanent injunctive relief prohibiting Defendants from continuing to engage in these unlawful activities, Kollmorgen will continue to suffer immediate and irreparable harm.

**COUNT 1.**
**BREACH OF CONTRACT**
**(Against Cavalieri for Breach of the RCNDA)**

60.    Kollmorgen repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

61.    The RCNDA is a valid, binding and enforceable contract.

62.    Cavalieri breached his obligations under the RCNDA by applying for, accepting and continuing to work as Vice President of Operations for Celera. Cavalieri's responsibilities in this position are nearly identical to his Director of Operations positions a Kollmorgen and within the restricted geographic territory. Cavalieri has a management and operations position with a direct competitor of Kollmorgen, and his position involves product and/or service planning, supply chain and quality control management and/or research and development responsibilities for products and services for which Cavalieri had planning, research or development responsibilities in the 24 months preceding his termination from Kollmorgen. Cavalieri's employment in this position, therefore, is in direct violation of Sections 6(c) and 6(g) of the RCNDA.

30.    Further, Cavalieri is supporting Celera, directly and/or indirectly, in its current efforts to solicit, offer, sell and actively compete for Kollmorgen customers and prospective customers in North America, including, but not limited to: ASML, Pacific Antenna Systems, and others that will be identified following entry of an appropriate protective order. Cavalieri had direct contact with these customers and/or learned/knew Kollmorgen Confidential Information related to the products and services provided to these customers within the last 24 months of his employment. This conduct is in violation of Sections 6(a), (b) and/or (e) of the RCNDA.

31.    Celera, through its Applimotion brand of frameless motors, among other products and services, has and continues to generally compete with Kollmorgen in the Aerospace & Defense, Robotics and Medical Device industries, including with Kollmorgen customers and potential customers in North America such as: Northrup Grumman Remotec, L-3 Daytron, CPI Malibu, Aerovironment, ASML, Tecnar, IJK Controls, Pacific Antenna Systems and others that will be identified following entry of an appropriate protective order. Cavalieri had direct contact

with these customers and/or learned/knew Kollmorgen Confidential Information related to the products and services provided to some or all of these customers within the last 24 months of his employment. This conduct is in violation of Sections 6(a), (b) and/or (e) of the RCNDA.

63.    Cavalieri possesses extensive and intimate knowledge of Kollmorgen's trade secrets and Kollmorgen Confidential Information, and he cannot effectively perform his duties at Celera without disclosing, using or relying on Kollmorgen's trade secrets and Kollmorgen Confidential Information. On information and belief, Cavalieri has directly and/or indirectly used or disclosed to Novanta/Celera, Kollmorgen Confidential Information in breach of Section 1(b) and/or 6(e) of the RCNDA.

64.    Cavalieri's material breaches of the RCNDA has proximately caused Kollmorgen to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and Kollmorgen is entitled to recover these damages from Cavalieri.

65.    Absent temporary and permanent injunctive relief, Cavalieri's breaches of the RCNDA will continue to cause irreparable injury to Kollmorgen and its business.

66.    Kollmorgen is entitled to temporary and permanent injunctive relief, compensatory damages, and attorneys' fees, expenses and costs pursuant to Section 9 of the RCNDA.

### COUNT 2.
### BREACH OF CONTRACT
### (Against Cavalieri for Breach of the Separation Agreement)

67.    Kollmorgen repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

68.    The Separation Agreement is a valid, binding and enforceable contract.

69.    Cavalieri breached his obligations under the Separation Agreement by applying for, accepting and continuing to work as Vice President of Operations for Celera.   Cavalieri's responsibilities in this position are nearly identical to his Director of Operations positions at Kollmorgen and within the restricted geographic territory.   Cavalieri has a management and operations position with a direct competitor of Kollmorgen, and this position involves product and/or service planning and/or research and development responsibilities for products and services for which Cavalieri had planning, research or development responsibilities in the 24 months preceding his termination from Kollmorgen.   Cavalieri's employment in this position, therefore, is in direct violation of Section 5(a) of the Separation Agreement.

70.    Further, Cavalieri is supporting Celera, directly and/or indirectly, in its current efforts to solicit, offer, sell and actively compete for Kollmorgen customers and prospective customers in North America, including, but not limited to:  ASML, Pacific Antenna Systems, and others that will be identified following entry of an appropriate protective order.  Cavalieri  had direct contact with these customers and/or learned/knew Kollmorgen Confidential Information related to the products and services provided to these customers within the last 24 months of his employment.  This conduct is in violation of Sections 5(a) of the Separation Agreement.

71.    Celera, through its Applimotion brand of frameless motors, among other products and services, has and continues to generally compete with Kollmorgen in the Aerospace & Defense, Robotics and Medical Device industries, including with Kollmorgen customers and potential customers in North America such as:  Northrup Grumman Remotec, L-3 Daytron, CPI Malibu, Aerovironment, ASML, Tecnar, IJK Controls, Pacific Antenna Systems, and others that will be identified following entry of an appropriate protective order.  Cavalieri  had direct contact with these customers and/or learned/knew Kollmorgen Confidential Information related to the

products and services provided to some or all of these customers within the last 24 months of his employment. This conduct is in violation of Sections 5(a) of the Separation Agreement.

72.    Cavalieri possesses extensive and intimate knowledge of Kollmorgen's trade secrets and Kollmorgen Confidential Information, and he cannot effectively perform his duties at Celera without disclosing, using or relying on Kollmorgen's trade secrets and Kollmorgen Confidential Information. On information and belief, Cavalieri has directly and/or indirectly used or disclosed to Novanta/Celera, Kollmorgen Confidential Information in breach of Section 5(a) of the Separation Agreement.

73.    Cavalieri's material breaches of the Separation Agreement has proximately caused Kollmorgen to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and Kollmorgen is entitled to recover these damages from Cavalieri.

74.    As a result of Cavalieri's material breaches, Kollmorgen is entitled to recoup all amounts paid to Cavalieri thereunder until he fully and materially complies with his obligations therein.

75.    Absent temporary and permanent injunctive relief, Cavalieri's breaches of the Separation Agreement will continue to cause irreparable injury to Kollmorgen and its business.

76.    Kollmorgen is entitled to temporary and permanent injunctive relief, compensatory damages, and attorneys' fees, expenses and costs pursuant to Section 12 of the Separation Agreement.

## COUNT 3.
## DECLARATORY JUDGMENT UNDER §§ 8.01-184, et seq.
### (Cavalieri's Material Breach Suspends Kollmorgen's Obligations)

77.    Kollmorgen repeats and incorporates by reference each and every allegation set forth in the above, as if fully set forth herein.

78.    There is an actual and immediate controversy between Kollmorgen and Cavalieri, within the meaning of Virginia Code §§ 8.01-184, et seq., as to whether this Court will declare that Cavalieri materially breached Section 5(a) of the Separation Agreement and declare that Kollmorgen is not obligated to pay Cavalieri severance, or any amount under the Separation Agreement to Cavalieri until he has fully and materially complied with his obligations under the Separation Agreement.

79.    This controversy is concrete and capable of judicial resolution.

80.    Justiciable issues exist for which declaratory relief is appropriate under Virginia Code §§ 8.01-184, et seq., and all parties to the controversy are before this Court.

81.    Kollmorgen requests that this Court, pursuant to Virginia Code §§ 8.01-184, et seq., declare that Cavalieri materially breached the Separation Agreement, that Kollmorgen is not obligated to pay Cavalieri any amount under the Separation Agreement, including severance, until Cavalieri fully and materially complies with his obligations under the Separation Agreement. Kollmorgen further requests that this Court otherwise declare the respective rights and legal relations of the parties.

## COUNT 4.
## TRADE SECRET MISAPPROPRIATION UNDER § 59.1-336, et seq.
### (Cavalieri's Actual and/or Threatened Misappropriation of Trade Secrets)

82.    Kollmorgen repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

83.     Kollmorgen is the owner of and was in possession of trade secrets in, among other things: motor designs and engineering solutions; product improvements and strategies; service improvements and strategies; customer and supplier data, reports, and information (including customer agreements, customer lists, contract terms, customer buying practices, etc.); customer prospects, proposals and work in progress; current and prospective product applications; marketing and sales plans; technical processes and techniques; technical information, know-how and research and development; formulae; inventions and invention disclosures; discoveries; drawings; invention methods and systems; prototypes and models; business plans, projections, prospects, opportunities and strategies; competitive analyses; product costs; manufacturing costs; pricing information; business forecast information; financial information and plans (including, but not limited to, those related to revenue, cost and profit associated with products and services); software, source code and object code; management information; and plans or proposals related to the foregoing.

84.     Throughout his employment and as both Director of Operations and Senior Director of Operations and as a member of the North American Leadership Team, Cavalieri was intimately familiar with and given access to Kollmorgen's trade secret information, and was under obligations to protect the confidential nature of Kollmorgen's trade secrets.

85.     Both the 2017 and 2018 Strategic Plans identify and contain Kollmorgen trade secrets related to, among other things, competition with and planned expansion into areas in which Novanta/Celera directly compete with Kollmorgen.

86.     Cavalieri is intimately familiar with Kollmorgen's frameless, brushless motors and all manner of trade secrets related thereto.  Cavalieri was likewise familiar with Kollmorgen's

trade secrets related to its new generation of frameless, brushless motors that target the Robotics and other markets in which Novanta and Celera compete.

87.     At all relevant times, Kollmorgen has taken reasonable and appropriate steps to maintain the secrecy and confidentiality of its trade secrets.

88.     Kollmorgen's trade secrets derived independent economic value, actual or potential, in not being generally known or readily ascertainable by competitors.

89.     Cavalieri cannot effectively perform his duties as Vice President of Operations for Celera without disclosing, using or relying on Kollmorgen's trade secrets.  Based on the circumstances to date, and Novanta's and Celera's refusal to remove Cavalieri as the Vice President of Operations and take all necessary steps to ensure that Cavalieri is not violating his agreement with Kollmorgen, it is clear that Novanta and Celera are unable or unwilling to adequately safeguard Kollmorgen's trade secrets which cannot be adequately protected by Cavalieri in his position as Vice President of Operations.

90.     Cavalieri has and/or will disclose without express or implied consent Kollmorgen trade secrets which he has contractual and legal duties to maintain as secret.

91.     Kollmorgen is entitled to an injunction to prohibit this actual or threatened misappropriation as set forth in Virginia Code § 59.1-337.  *See MeadWestvaco Corp. v. Bates*, 91 Va. Cir. 509, 525 (Cir. Ct. 2013)

### COUNT 5.
### TORTIOUS INTERFERENCE WITH CONTRACT
**(Against Novanta & Celera for Tortious Interference with the RCNDA)**

92.     Kollmorgen repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

93.     A valid and binding contractual relationship exists between Cavalieri and Kollmorgen in the form of the RCNDA.

94.     Novanta and Celera knew and know that the RCNDA existed and exists between Cavalieri and Kollmorgen.

95.     Notwithstanding their knowledge of the RCNDA, Novanta and Celera intentionally, willfully and purposefully interfered with Kollmorgen's contractual relationship with Cavalieri by, among other ways, inducing and/or causing Cavalieri to breach and/or continue to breach his obligations to Kollmorgen under the RCNDA.

96.     Novanta's and Celera's interference with Kollmorgen's contractual relationship with Cavalieri directly and proximately caused Cavalieri's breach or continued breach of his obligations to Kollmorgen under the RCNDA and the resulting damages and deprivation of benefit to Kollmorgen.

97.     Novanta's and Celera's tortious interference with the RCNDA has proximately caused Kollmorgen to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and Kollmorgen is entitled to recover these damages from Novanta and Celera.

98.     Absent temporary and permanent injunctive relief, Novanta's and Celera's tortious interference with the RCNDA will continue to cause irreparable injury to Kollmorgen and its business.

99.     Novanta's and Celera's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.

100.    As a result, Kollmorgen is entitled to recover punitive damages for Novanta's and Celera's wrongful conduct.

## COUNT 6.
## SPECIFIC PERFORMANCE
### (Requiring Cavalieri to Disclose Developments)

101.    Kollmorgen repeats and realleges the allegations contained in all of the preceding paragraphs of the Complaint, as though fully set forth herein.

102.    Pursuant to Section 3 of the RCNDA, Cavalieri assigned to Kollmorgen his entire right, title and interest in any Developments (defined therein), which he may solely or jointly conceive, write or acquire in whole or in part during his employment for Kollmorgen, and for a period of six months thereafter, and which relate in any way to the actual or anticipated business of Kollmorgen or research or development of Kollmorgen.

103.    Pursuant to Section 4 of the RCNDA, Cavalieri agreed to promptly disclose any and all Developments to Kollmorgen, and this includes Developments that were conceived, written or acquired since Cavalieri has been employed with defendants Novanta and Celera, which relate in any way to the actual or anticipated business of Kollmorgen or research or development of Kollmorgen.

104.    Kollmorgen and Novanta/Celera are motion control competitors.   Thus, any development solely or jointly conceived, written or acquired by Cavalieri at Novanta or Celera will relate, in some way, to the actual or anticipated business of Kollmorgen or research or development of Kollmorgen.

105.    Cavalieri has not yet disclosed to Kollmorgen, and likely will not disclose to Kollmorgen, his Developments at Novanta and Celera within six months of January 5, 2019 without a Court Order compelling such disclosure.

106.    Kollmorgen, therefore, requests an Order requiring Cavalieri to specifically perform his obligations to Kollmorgen pursuant to Section 4 of the RCNDA and promptly disclose any and all such Developments to Kollmorgen.

## PRAYER FOR RELIEF

WHEREFORE, Kollmorgen prays that:

1.    Kollmorgen be awarded a temporary and permanent injunction against Cavalieri enjoining and restraining Cavalieri from breaching the RCNDA and Settlement Agreement and engaging in actual or threatened misappropriation of Kollmorgen's trade secrets.

2.    Kollmorgen be awarded a temporary and permanent injunction against Novanta and Celera enjoining and restraining Novanta and Celera from tortiously interfering with the RCNDA and/or Separation Agreement;

3.    Kollmorgen be provided the benefit of the full restrictive time periods specified in the RCNDA by extending the duration of the injunctions sought in paragraphs 1 and 2 of its Prayer For Relief by a period of time equal in length to the period during which the violations of the RCNDA have occurred pursuant to applicable law;

4.    This Court enter an Order declaring that Kollmorgen is not obligated to pay Cavalieri severance, or any other amount under the Separation Agreement and/or declaring that Kollmorgen is not obligated to pay Cavalieri severance, or any other amount under the Separation Agreement, until such time as he fully and materially complies with his obligations under the Separation Agreement;

5.    This Court enter an Order requiring Cavalieri to fully comply with Section 4 of the RCNDA and disclosure all Developments that are required to be disclosed under Sections 3 and 4 of the RCNDA during the six (6) month period following the end of Cavalieri's employment with Kollmorgen;

6.  Kollmorgen be awarded compensatory damages against Defendants in the amount of One Hundred Thousand Dollars ($100,000.00);

(a)  Kollmorgen's recovery against Defendants include, without limitation: forfeiture, recoupment and disgorgement of all profits and gains realized by Defendants from the foregoing wrongful acts, and payment of lost profits to Kollmorgen;

(b)  Kollmorgen's recovery against Cavalieri include, without limitation: forfeiture, recoupment and disgorgement of all compensation paid to Cavalieri during the time period of his violations of his contractual and legal duties to Kollmorgen;

7.  Kollmorgen be awarded temporary and permanent injunctive relief, attorneys' fees, costs and expenses pursuant to Section 9 of the RCNDA and Section 12 of the Separation Agreement or as otherwise provided by law;

8.  Kollmorgen be awarded punitive damages of Three Hundred Fifty Thousand Dollars ($350,000.00) against Novanta and Celera for tortious interference or as otherwise provided by law;

9.  Kollmorgen be awarded attorneys' fees, costs and expenses against Defendants to the fullest extent permitted by law;

10.  Kollmorgen be awarded interest and costs;

11.  Kollmorgen be awarded such other and further relief as the Court deems proper.

A TRIAL BY JURY IS DEMANDED.

Dated: March 5, 2018

KOLLMORGEN CORPORATION.

By: _____
         Of Counsel

Joshua F. P. Long (VSB#65684)
Joshua R. Treece (VSB#79149)
WOODS ROGERS PLC
Wells Fargo Tower, Suite 1400
10 South Jefferson Street
Post Office Box 14125
Roanoke, Virginia  24038-4125
Telephone No. (540) 983-7600
Facsimile No. (540) 983-7711
jlong@woodsrogers.com
jtreece@woodsrogers.com

          Counsel for Plaintiff

A TRUE COPY:
TESTE: _____
                    DEPUTY CLERK
CIRCUIT COURT, RADFORD, VA.

# Exhibit 1

Daily Bookkeeping - We take care of your Bookkeeping! VA DC MD Taxes, Payroll and Bookkeeping  Ad  ⋯


"Don't forget to take your Vitamin C."
-Mother Nature

LEARN MORE

Simply Orange

Gently Pasteurized

# Michael Cavalieri · 2nd

Vice President of Operations at Novanta Inc.

Blacksburg, Virginia

**Connect**    🔒 **Message**    More...

 Novanta Inc.

 Virginia Polytechnic Institute and State University

🪪 See contact info

👥 500+ connections

Experienced Senior Director Of Operations with a demonstrated history of working in the industrial automation industry. Skilled in Engineering, Cross-functional Team Leadership, Manufacturing, Management, and Lean Manufacturing. Strong operations professional with a Master of Business Administration (M.B.A.) focused in Business, Management, Marketing, and Related Support Services from Virginia Polytechnic Institute and State University.

## Highlights

 **1 Mutual Connection**
You and Michael both know Brian McCahill

## Experience

 **Vice President of Operations**
Novanta Inc.
Feb 2019 – Present · 1 mo
Bedford, MA

 **Fortive Automation & Specialty Platform**
5 yrs

**Sr. Director of Operations, Kollmorgen - North America**
Jan 2018 – Jan 2019 · 1 yr 1 mo
Radford, VA /

**Director of Operations - Kollmorgen Custom Business Unit**
Mar 2016 – Jan 2018 · 1 yr 11 mos

**Director of Operations - Kollmorgen Industrial Automation**
Feb 2014 – Mar 2016 · 2 yrs 2 mos
Radford, Virginia

Show fewer roles ︿

 **Danaher Corporation**
4 yrs 5 mos

**Business Unit Director - Dover Motion**
Dec 2012 – Feb 2014 · 1 yr 3 mos

### People Also Viewed

 **Melissa Hammerle** · 3rd
Vice President & General Manager at Fortive

**Dan St. Martin** · 2nd
President at Kollmorgen (a Fortive/Danaher Company)

**Jessica Clarke** · 2nd
Manufacturing Excellence Leader, US / Canada

**David Burke** · 2nd
Project Manager at Kollmorgen (a Fortive / Danaher company)

**Alicia Fehr**
Manufacturing Specialist 4 at GE

**Paul Moody**
Computer Hardware Professional

 **Harry Rehder** · 3rd
Project Coordinator/ESD Program Manager at California Integration Coordinators

**Ala Tayeh**
Owner at Amazing Athletes of Sacramento, California

**Lauren Finman**
Business Administrator at ProChem Incorporated

**jarren stone**
electrition at stone electric

### Learn the skills Michael has

 **Lean Six Sigma: Define and Measure Tools**
Viewers: 11,029

**Six Sigma: Green Belt**
Viewers: 166,334

 **Lean Inventory Management**
Viewers: 9,464

 Messaging

Boxborough, Massachusetts

○ **Operations and Supply Chain Manager - Dover Motion**
May 2011 – Dec 2012 · 1 yr 8 mos
Boxborough, Massachusetts

○ **Inside Sales & Customer Service Manager - Dover Motion**
Oct 2009 – May 2011 · 1 yr 8 mos
Boxborough, Massachusetts

Show fewer roles ∧

 **Kollmorgen**
5 yrs 5 mos

○ **Product Line Manager/Operations Manager**
Jan 2009 – Oct 2009 · 10 mos
Radford, Virginia

○ **Continuous Improvement Manager**
May 2007 – Jan 2009 · 1 yr 9 mos
Juarez, CH Mexico/Marengo, IL/Rockford, IL/Salem, NH/Radford, VA

○ **Area Manager/Process Engineer**
Dec 2005 – Apr 2007 · 1 yr 5 mos
Radford, Virginia

○ **Process Engineer**
Jun 2004 – Dec 2005 · 1 yr 7 mos
Radford, Virginia

Show fewer roles ∧

## Education

 **Virginia Polytechnic Institute and State University**
Master of Business Administration (M.B.A.), Business, Management, Marketing, and
Related Support Services
2005 – 2009

 **Virginia Polytechnic Institute and State University**
Bachelor's Degree, Mechanical Engineering
2000 – 2004

## Skills & Endorsements

**Lean Manufacturing** · 6

 Endorsed by **Frank Matyoka** and 1 other who is highly skilled at this

Endorsed by 2 of Michael's colleagues at Danaher Corporation

**Manufacturing**

Endorsed by **Edward Hammond** and 1 other who is highly skilled at this

Endorsed by 2 of Michael's colleagues at Kollmorgen

**Product Development** · 4

Lauren Quesenberry and 3 connections have given endorsements for this skill

Industry Knowledge

**Continuous Improvement**        Kaizen

**Engineering**

**See more courses**

**Promoted**                                    ···

 **Online MBA**
Choose from Kellers 10
concentrations - No GRE/GMAT
required.

 **41 New Virginia Clients**
41 new legal clients seeking a
Virginia attorney. View their cases
today.

**Outsourced Bookkeeping**
We take care of Bill payment,
Customer Billing, create Monthly
Financials.

3   Messaging

Interpersonal Skills

**Management** · 3                               **Cross-functional Team Leadership** · 2

Show less ⌃

## Interests

**Kaman Distribution**
12,042 followers

**Novanta Inc.**
6,757 followers

**AMETEK**
28,567 followers

**Kollmorgen**
8,470 followers

**KUKA Robotics**
114,647 followers

**Yaskawa Motoman**
22,501 followers

See all

**Linked** in

Resolution Policy
Feedback
Settings

LinkedIn Corporation © 2019

? **Questions?**
Visit our Help Center.

⚙ **Manage your account and privacy.**
Go to your Settings.

Select Language

English (English)

A TRUE COPY:
TESTE: _Melissa White_
DEPUTY CLERK
CIRCUIT COURT, RADFORD, VA.

3   Messaging

# Exhibit 2

**Job Title:**      Director of Operations
**Department:**      Global Operations
**Reports To:**      VP Global Operations
**FLSA Status:**    Exempt

## POSITION SUMMARY:

The Director of Operations is a key member of the Global Operations team and is responsible for developing and executing Operational strategy for assigned locations which satisfies Customer Demand and achieves Key Business Objectives. The Director is also an engaged member of the Kollmorgen North America Leadership Team.

## ESSENTIAL DUTIES AND RESPONSIBILITIES:
Along with those identified below, other duties may be assigned.

- Manages a site(s) Operations team which fulfills internal and external customer demand.
- Develops and delivers Operations forecasts for Revenue and Cost
- Provides leadership for and improves Engagement of Associates directly involved in Operations and Associates working with Operations
- Ensures that best practices for Lean Manufacturing, Process Quality, and Visual Management are used in the manufacture of products
- Manages and delivers improvements in safety, quality, lead time, cost, and productivity through use of Kollmorgen Business System tools.
- Manages and improves Working Capital through reduction of inventory and increasing inventory turns
- Leads Operations reviews with Site teams to ensure targets are met and rigorous problem solving process is applied.
- Develops associates in a manner which meets the future needs of the organization and prepares annual plan with HR partners to identify key contributors, areas of organizational and individual development, and succession planning
- Actively focuses on Engagement of site Operations associates and all associates interacting with assigned locations.
- Responsible for EHS and Environmental Risk Management for assigned locations
- Leads and influences Supply Chain team members to provide further improvement in cost and effectiveness
- Leads PSI for assigned locations and Works closely with Sales and Marketing to optimize resources needed to support customer demand.
- Works closely with Product Design and Marketing functions to support Product Development initiatives

## MEASUREMENTS:
- On Time Delivery
- External and Internal Quality
- Cost and Margin Expansion (Productivity, PPV, VAVE, Scrap, etc)
- Inventory and Inventory Turn Improvement
- Associate Engagement
- New Product Development Projects on Time and on Budget

**QUALIFICATIONS:**
To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**Charts the Course**
- Utilizes critical thinking
- Moves strategy to action
- Leads in a global environment

**Drives Innovation and Growth**
- Listens and responds to customer needs
- Cultivates and enables breakthrough thinking to drive growth
- Encourages balanced risk taking to advance innovation

**Champions Continuous Improvement**
- Solves problems
- Drives for results

**Builds People, Teams and Organizations**
- Relentlessly attracts, engages and develops people
- Builds strong effective and diverse organizations
- Creates followership through collaboration

**Acts with Integrity**
- Consistently uses sound judgment
- Operates with transparency and is trusted
- Demonstrates humility and self-awareness

**Additional Skills and Qualifications**
- Technical knowledge of Product and Manufacturing processes
- Prior operations daily management, process development and organizational development experience in a Lean/Pull operations environment required
- Financial Acumen
- Strong written, verbal and computer skills
- Excellent communications and instruction skills
- Demonstrated proficiency in time and project management
- Success in managing through influence, persuasion, coaching and counseling
- Ability to accurately assess key business metrics and situations from a Senior Leadership perspective
- Demonstrated aptitude in organization development through a combination of effective talent planning and associate development

**EDUCATION and/or EXPERIENCE**

- Bachelor's Degree in Engineering or related technical experience
- 10 years of experience in Engineering or Operations
- 5+ years leading teams and developing talent

A TRUE COPY:
TESTE: *Melissa White*
DEPUTY CLERK
CIRCUIT COURT, RADFORD, VA.

# Exhibit 3



**FORTIVE CORPORATION AND ITS AFFILIATED ENTITIES**
**AGREEMENT REGARDING COMPETITION AND PROTECTION OF PROPRIETARY INTERESTS**

*Fortive Corporation believes that recruiting and retaining the best people to work in its highly competitive businesses means treating them fairly, rewarding their contributions, and thereby establishing a strong partnership for our collective well-being and continued success. Working at Fortive and/or any of its affiliates provides associates with specialized and unique knowledge and confidential information and access to key business relationships, which, if used in competition with Fortive and/or its affiliates, would cause harm to Fortive and/or its affiliates. As such, it is reasonable to expect a commitment from our associates that protects the legitimate business interests of Fortive and its affiliates, and therefore, their own interests. Please read and sign this Agreement in the spirit intended: our collective long-term growth and success.*

I understand that I am or will be employed by or enter into a relationship with Fortive Corporation including its subsidiaries and/or affiliates (collectively the "Company"), and will learn and have access to the Company's confidential, trade secret and proprietary information and key business relationships. I understand that the products and services that the Company develops, provides and markets are unique. Further, I know that my promises in this Agreement are an important way for the Company to protect its proprietary interests.

I agree that the Company is engaged in a business which is highly specialized, the identity and particular needs of Company's customers and vendors are not generally known, and the documents and information regarding, among other things, the Company's employees and talent, the Fortive Business System, customers, vendors, services, products, technology, formulations, methods of operation, sales, marketing, pricing, and costs are highly confidential and proprietary.

I acknowledge and agree that I have been given an adequate period of time to consider this Agreement and to have this Agreement reviewed at my expense and by an attorney of my choice regarding the terms and legal effect of this Agreement. I have read this Agreement and understand all of its terms and conditions and am entering into this Agreement of my own free will without coercion from any source. I have not and am not relying on legal advice provided by the Company or any personnel of the Company.

I agree the above recitals are material terms of this Agreement.

In addition to other good and valuable consideration, I am expressly being given employment, continued employment, a relationship with the Company, renewal of a relationship with the Company, a promotion, eligibility to receive grants of stock options or other equity awards, certain monies, benefits, training and/or trade secrets and confidential information of the Company and its or their customers, suppliers, vendors or affiliates to which I would not have access but for my relationship with the Company in exchange for my agreeing to the terms of this Agreement. In consideration of the foregoing, I agree as follows:

1.     **Protection of Confidential Information**.

a.     **Definition of "Confidential Information"**.   The term "Confidential Information" shall mean the trade secrets and other confidential information of the Company which is not generally known to the public, and which (a) is generated or collected by or utilized in the operations of the Company and relates to the actual or anticipated business or research or development of the Company or the Company's actual or prospective vendors or customers; or (b) is suggested by or results from any task assigned to me by the Company or work performed by me for or on behalf of the Company or any customer of the Company. Confidential Information shall not be considered generally known to the public if revealed improperly to the public by me or others without the Company's express written consent and/or in violation of an obligation of confidentiality to the Company. Examples of Confidential Information include, but are not limited to, customer and supplier identification and contacts, information about customers, Voice of the Customer data, reports or analyses, business relationships, contract terms, pricing, price lists, pricing formulas, margins, business plans, projections, prospects, opportunities or strategies, acquisitions,

divestitures or mergers, marketing plans, advertising or promotions, financial data (including but not limited to the revenues, costs, or profits, associated with any products or services), business and customer strategy, techniques, formulations, technical information, technical know-how, formulae, production information, inventions, invention disclosures, discoveries, drawings, invention methods, systems, information regarding all or any portion of the Fortive Business System, lease structure, processes, designs, plans, architecture, prototypes, models, software, source code, object code, solutions, Talent Reviews and Organizational Plans, research and development, copyrights, patent applications and plans or proposals related to the foregoing.

   b.  **Nondisclosure and Prohibition against Misuse.** At all times during and after the termination of my employment or relationship with the Company, I will not, without the Company's prior written permission, directly or indirectly for any purpose other than performance of my duties for the Company, utilize or disclose to anyone outside of the Company any Confidential Information, or any information received by the Company in confidence from or about third parties, as long as such matters remain trade secrets or confidential. The confidentiality obligations herein or elsewhere in this Agreement shall not prohibit me from divulging Confidential Information by order of court or agency of competent jurisdiction or as otherwise required by law.

   c.  **Notice of Immunity under the Defend Trade Secrets Act.** I acknowledge and agree that the Company has provided me with written notice below that the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), provides an immunity for the disclosure of a trade secret to report suspected violations of law and/or in an anti-retaliation lawsuit, as follows:

    (1) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

    (2) An individual who an employer for retaliation for reporting a suspected violation of law may disclose the trade secret to his or her attorney and use the trade secret information in the court proceeding, if the individual: (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

2.  **Return of Property and Copying** I agree that all tangible materials (whether originals or duplicates), including but not limited to, notebooks, computers, files, reports, proposals, price lists, lists of actual or potential customers or suppliers, talent lists, formulae, prototypes, tools, equipment, models, specifications, technical data, methodologies, research results, test results, financial data, contracts, agreements, correspondence, documents, computer disks, software, computer printouts, information stored electronically, memoranda, and notes, in my possession or control which in any way relate to the Company's business and which are furnished to me by or on behalf of the Company or which are prepared, compiled or acquired by me while working with or employed by the Company shall be the sole property of the Company. I will at any time upon the request of the Company and in any event promptly upon termination of my employment or relationship with the Company, but in any event no later than two (2) business days after such termination, deliver all such materials to the Company and will not retain any originals or copies of such materials, whether in hard copy form or as computerized and/or electronic records. Except to the extent approved by the Company or required by my bona fide job duties for the Company, I also agree that I will not copy or remove from the Company's place of business or the place of business of a customer of the Company, property or information belonging to the Company or the customer or entrusted to the Company or the customer. In addition, I agree that I will not provide any such materials to any competitor of or entity seeking to compete with the Company unless specifically approved in writing by the Company.

3.  **Assignment of Developments** I hereby assign to the Company my entire right, title and interest in any idea, formula, invention, discovery, design, drawing, process, method, technique, device, improvement, computer program and related documentation, technical and non-technical data, work of authorship, trade secret, copyright, trademark, service mark, trademark registration, application for trademark registration, and patent and patent applications (all hereinafter called "Developments"), which I may solely or jointly conceive, write or acquire in whole or in part during the period I am employed by or working for the Company, and for a period of six months thereafter, and which relate in any way to the actual or anticipated business or research or development of the Company, or which are suggested by or result from any task assigned to me or work performed by me for or on

behalf of the Company, whether or not such Developments are made, conceived, written or acquired during normal hours of work or using the Company's facilities, and whether or not such Developments are patentable, copyrightable or susceptible to other forms of protection. The term "Developments" does not apply to any development for which no equipment, supplies, facilities or trade secret or Confidential Information of the Company was used, and which was developed entirely on my own time unless (a) the Development relates: (i) to the actual or anticipated business of the Company; or (ii) to the Company's actual or demonstrably anticipated research or development or (b) the Development results from any work performed by me for the Company. I acknowledge and agree that any intellectual property right in any Developments and related documentation, and work of authorship, which are created within the scope of my relationship with the Company, are owned solely by the Company.

4.     **Disclosure of Developments**  I will promptly disclose any Developments referred to in Paragraph 3 to the management of the Company, including by following the Company's policies and procedures in place from time to time for that purpose, and I will, on the Company's request, promptly execute a specific assignment of title to the Company and such other documents as may reasonably be requested by the Company for the purpose of vesting, confirming or securing the Company's title to the Developments, and I will do anything else reasonably necessary, at the Company's sole expense, to enable the Company to secure a patent, trademark registration, copyright or other form of protection thereof in the United States and in other countries even after the termination of my employment or work relationship with the Company. If the Company is unable, after reasonable effort, to secure my signature or other action, whether because of my physical or mental incapacity or for any other reason, I hereby irrevocably designate and appoint the Company as my duly authorized agent and attorney-in-fact, to act for and on my behalf and stead to execute any such document and take any other such action to secure the Company's rights and title to the Developments.

5.     **Identification of Developments and Third Party Obligations**.

     (a)  I have identified below all Developments in which I have any right, title or interest, and which were made, conceived or written wholly or in part by me prior to my employment or relationship with the Company and which relate to the actual or anticipated business or research or development of the Company. I represent and warrant that I am not a party to any agreements which would limit my ability to work for the Company or to assign Developments as provided for in Paragraph 3.

_____

_____

_____

     (b)  I acknowledge that the Company from time to time may have agreements with other persons or with the United States government or agencies thereof, or other governments or governmental agencies, which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. I agree to be bound by all such obligations and restrictions that are made known to me and to take all action necessary to discharge the obligations of the Company under such agreements.

6.     **Protection of Proprietary Interests**.

     (a)  I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, solicit or participate in soliciting any person, company or entity to purchase or contract for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company, if that person, company  or entity was a customer or potential customer of the Company for such products or services with which I had direct contact or about which I learned Confidential Information related to such products or services at any time during the 24 months preceding the termination of my employment or relationship with the Company.

(b) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with which I had direct contact regarding such products or services at any time during the 24 months preceding the termination of my employment or relationship with the Company.

(c) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not directly or indirectly, on behalf of myself or in conjunction with any other person, company or entity, own (other than less than 3% ownership in a publicly traded company), manage, operate, or participate in the ownership, management, operation, or control of, or be employed by any person, company or entity which is in competition with the Company, with which I would hold a position with responsibilities similar to any position I held with the Company during the 24 months preceding the termination of my employment or relationship with the Company or in which I would have responsibility for and access to confidential information similar or relevant to that which I had access to during the 24 months preceding the termination of my employment or relationship with the Company in any geographic territory over which I had Company responsibilities during the 24 months preceding the termination of my employment or relationship with the Company.

(d) I agree that during my employment or relationship with the Company and for a period of 12 months thereafter, I will not, nor will I assist any third party to, directly or indirectly (i) raid, hire, solicit, encourage or attempt to persuade any employee or independent contractor of the Company, or any person who was an employee or independent contractor of the Company during the 6 months preceding the termination of my employment or relationship with the Company, who possesses or had access to Confidential Information of the Company, to leave the employ of or terminate a relationship with the Company; (ii) interfere with the performance by any such persons of their duties for the Company; or (iii) communicate with any such persons for the purposes described in Paragraph 6(d)(i) and (ii).

(e) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, utilize or reveal confidential contract or relationship terms with any vendor or customer used by or served by the Company at any time during the 24 months preceding the termination of my employment or relationship with the Company.

(f) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, on behalf of myself or any other person, company or entity, interfere with or assist any third party in interfering with, the relationship of the Company with any vendor utilized by the Company at any time during the 24 months preceding the termination of my employment or relationship with the Company.

(g) I agree that during my employment or relationship with the Company and for a period of 12 months thereafter I will not directly or indirectly, on behalf of myself or any other person, company or entity, participate in the planning, research or development of any products or services, competitive with products or services of the Company, excluding general industry knowledge, for which I had product or service planning, research or development responsibilities during the 24 months preceding the termination of my employment or relationship with the Company.

(h) I agree that during my employment or relationship with the Company, and for a period of 12 months thereafter, I will not, directly or indirectly, become employed or engaged by or affiliated with any person, company or entity that was a vendor or customer of the Company, during the 24 months preceding the termination of my employment or relationship with the Company, in any capacity in which I would work with or support products or services competitive with or similar to the products, services, or support offered by, performed by, developed by or created by me for the Company during the 24 months preceding the termination of my employment or relationship with the Company.

(i) I agree that nothing in this Section 6 shall limit my obligations under Paragraph 1 of this Agreement. Further, I understand and agree that during my employment or work relationship and the restricted time periods

thereafter designated in this Agreement, while I may gather information to investigate other employment opportunities, I understand and agree that I shall not make plans or prepare to compete, solicit or take on activities which are in violation of this Agreement.

       (j)  The confidentiality obligations in this Agreement, including in Paragraph 1(b) and 6(e) do not prohibit me from reporting violations of federal or state law or regulation to any governmental agency or from making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation, nor do the confidentiality obligations require me to notify the Company regarding any such reporting, disclosure or cooperation with the government.

7.     **Best Efforts**.  I agree that during my employment or relationship with the Company, I will devote my best efforts to the performance of my duties and the advancement of the Company and shall not engage in any other employment, profitable activities, or other pursuits which would cause me to disclose or utilize the Company's Confidential Information, or reflect adversely on the Company.  This obligation shall include, but is not limited to, obtaining the Company's consent prior to performing tasks for customers of the Company outside of my customary duties for the Company, giving speeches or writing articles, blogs, or posts, about the business of the Company, improperly using the name of the Company or identifying my association or position with the Company in a manner that reflects unfavorably upon the Company.  I further agree that I will not use, incorporate, or otherwise create any business entity or organization or domain name using any name confusingly similar to the name Fortive Corporation or the name of any affiliate of Fortive or any other name under which any such entities does business.

8.     **Certification**.  I agree not to disclose to the Company, or use in my work for the Company, any confidential information and/or trade secrets belonging to others, including without limitation, my prior employers, or any prior inventions made by me and which the Company is not otherwise legally entitled to learn of or use. Furthermore, by executing this Agreement, I certify that I am not subject to any restrictive covenants and/or obligations that would prevent me from fully performing my duties for the Company.  I also agree that after my employment or relationship with the Company terminates, the Company may contact any employer or prospective employer of mine to inform them of my obligations under this Agreement and that, for a period of five (5) years after my employment or relationship with the Company terminates, I shall affirmatively provide this Agreement to all subsequent employers.

9.     **Injunctive Relief and Attorney's Fees**.  In the event of a breach or a threatened breach of this Agreement by me, I acknowledge and agree that the Company will face irreparable injury which would be difficult to calculate in monetary terms and for which damages would be an inadequate remedy, I agree that the Company shall be entitled, in addition to remedies otherwise available at law or in equity, to obtain and enforce immediately temporary restraining orders, preliminary injunctions and final injunctions without the posting of a bond enjoining such breach or threatened breach.  Should the Company successfully enforce any portion of this Agreement before a trier of fact, the Company shall be entitled to receive and recover from me all of its reasonable attorney's fees, litigation expenses and costs incurred as a result of enforcing this Agreement against me.

10.    **Amendment, Waiver, Severability and Merger**.  Except as set forth in Paragraph 12 below, this Agreement is my entire agreement with the Company with respect to the subject matter hereof, and it amends (to the extent enforceable) all previous oral or written understandings or agreements, if any, made by or with the Company regarding the same subject matter and can be revoked or modified only by a written agreement signed by me and the Company.  No waiver of any breach of any provision of this Agreement by the Company shall be effective unless it is in writing and no waiver shall be construed to be a waiver of any succeeding breach or as a modification of any provision of this Agreement.  The provisions of this Agreement shall be severable and if any provision of this Agreement is found by any court to be unenforceable, in whole or in part, the remainder of this Agreement as well as the provisions of my prior agreement with the Company, if any, regarding the same subject matter as that which was found unenforceable herein shall nevertheless be enforceable and binding on the parties.  I also agree that the trier of fact may modify any invalid, overbroad or unenforceable term of this Agreement so that such term, as modified, is valid and enforceable under applicable law.  Further, I acknowledge and agree that I have not, will not and cannot rely on any representations not expressly made herein.  The terms of this Agreement shall not be amended by me or the Company except by the express written consent of the Company and me.  The paragraph headings in this Agreement are for convenience of reference and in no way define, limit or affect the meaning of this Agreement.

Gen NCA (06-2016)

11.    **At-Will Employment Status**. I acknowledge and agree that that nothing in this Agreement shall be construed or is intended to create a guarantee of employment, express or implied, for any specific period of time. I acknowledge and agree that this Agreement does not require me to continue my employment or relationship with the Company for any particular length of time (unless otherwise agreed to in writing as an independent contractor or consultant) and shall not be construed to require the Company to continue my employment, relationship or compensation for any particular length of time. I acknowledge and agree that if I am employed by the Company it is on an at-will basis which means that the Company and I each have the right to terminate the employment relationship with or without cause or reason, with or without notice or compliance with any procedures. If I am an independent contractor or consultant for the Company, unless agreed to otherwise in writing by the Company and me, the Company and I each have the right to terminate the relationship with or without cause or reason, with or without notice or compliance with any procedures. I acknowledge and agree that my knowledge, skills and abilities are sufficient to enable me, if my employment or relationship with the Company terminates, to earn a satisfactory livelihood without violating this Agreement.

12.    **Acknowledgment of Obligations.** I acknowledge that my obligations under this Agreement are in addition to, and do not limit, any and all obligations concerning the same subject matter arising under any applicable law including, without limitation, common law duties of loyalty and common law and statutory law relating to trade secrets.

13.    **Obligations Survive Termination.** I acknowledge and agree that the restrictions and covenants set forth in this Agreement shall be binding upon me and survive termination of my employment or relationship with the Company regardless of the reason(s) for such termination. I acknowledge and agree that the Company has an important and legitimate business interest that it is seeking to protect with this Agreement and that enforcement of this Agreement would not interfere with the interests of the public.

14.    **Cooperation.** I agree to cooperate in the truthful and honest prosecution and/or defense of any third party claim in which the Company may have an interest subject to reasonable limitations concerning time and place, which may include without limitation making myself available to participate in any proceeding involving the Company, allowing myself to be interviewed by representatives of the Company, appearing for depositions and testimony without requiring a subpoena, and producing and/or providing any documents or names of other persons with relevant information; provided that, if such services are required after the termination of my employment or relationship with the Company, it shall provide me reasonable compensation for the time actually expended in such endeavors and shall pay my reasonable expenses incurred at the prior and specific request of the Company.

15.    **Non-Disparagement.** I agree that during and after my employment or relationship with the Company ends for any reason, I will not make any false, disparaging or derogatory statement(s) to any media outlet, industry group, financial institution, current or former employee, consultant, client or customer of the Company, or any other entity or person, which are adverse to the interests, products, services or personnel of the Company or its and their customers or vendors. I further agree that I will not take any action that may reasonably cause the Company, its customers or its vendors embarrassment or humiliation, and I will not otherwise directly or indirectly cause the Company, its customers or its vendors to be held in disrepute. I understand that the foregoing non-disparagement provision does not apply on occasions when I provide truthful information in good faith to any federal or state governmental agency, entity or official investigating an alleged violation of federal or state law or regulation or when I make other disclosures that are protected under the whistleblower provisions of federal or state law.

16.    **Assignment and Transfer of Employment or Relationship.**. The rights and/or obligations herein may only be assigned by the Company, may be done without my consent and shall bind and inure to the benefit of the Company, its successors and assigns. If the Company makes any assignment of the rights and/or obligations herein or transfers my employment or relationship within the Company, I agree that this Agreement shall remain binding upon me. Notwithstanding the language in this Paragraph 16, in connection with and as a condition of any assignment or transfer of my employment or relationship the Company, a successor, or assignee of the Company shall have the right to terminate this Agreement and require me to sign a new Agreement Regarding Competition and the Protection of Proprietary Interests.

17.    **Change of Position**. I acknowledge and agree that any change in my position or title with the Company shall not cause this Agreement to terminate and shall not effect any change in my obligations under this Agreement.

18.  **Acceptance**.  I agree that this Agreement is accepted by me through my original or facsimile signature.  I further agree that the Company is deemed to have accepted this Agreement as evidenced by my employment or relationship with the Company, the payment of wages or monies to me, the provision of benefits to me, or by executing this Agreement.

19.  **Binding Effect**.  This Agreement, and the obligations hereunder, shall be binding upon me and my successors, heirs, executors, and representatives and shall inure to the benefit of the Company, its successors and its assigns.

20.  **Third Party Beneficiaries**.  This Agreement is intended to benefit each and every subsidiary, affiliate or business unit of the Company for which I perform services, for which I have customer contact or about which I receive Confidential Information and may be enforced by any such entity.  I agree and intend to create a direct, consequential benefit to the Company regardless of the Company entity with which I am affiliated on the last day of my employment or relationship with the Company.

Agreed to by:

Associate Signature

MICHAEL A. CAVALIERI
Associate's Printed Name

Date:   1/5/2018

Fortive Corporation

By:

Jeffrey D. Lemons
Print Name and Title

Date:   1/5/2018

A TRUE COPY:
TESTE: Melissa White
DEPUTY CLERK
CIRCUIT COURT, RADFORD, VA.

## Exhibit 4

## SEPARATION AGREEMENT AND GENERAL RELEASE

You, Michael Cavalieri, and Kollmorgen Corporation (the "Company") agree as follows:

1. **Separation Date.** Your employment shall terminate on Friday, January 04, 2019 (the "Separation Date"). You shall not perform any duties, functions, or services for the Company after the Separation Date. Irrespective of whether you sign this Separation Agreement and General Release (the "Agreement"), you will be paid all wages earned through the Separation Date and shall be eligible to receive any vested benefit in accordance with the terms of the applicable benefit plan.

2. **Severance Pay and other Consideration**. In exchange for your promises in this Agreement, including the general release, if you timely sign and return this Agreement and do not thereafter revoke it as provided below, then:

(a) **Severance Pay**. Pursuant to the Salaried Employees Severance Pay Plan of Kollmorgen Corporation and Its Affiliated Companies (As Amended and Restated Effective July 2, 2016) (the "Plan"), the Company shall pay you the gross amount of Fifty Thousand Twenty Three Dollars and Eight Cents ($50,023.08) ("Severance Pay"), which represents fourteen (14) weeks of your annual base pay calculated in accordance with the Plan. This Severance Pay shall be subject to applicable withholding and payroll deductions and shall be paid consistent with the Company's normal payroll cycle beginning no sooner than fifteen (15) days after you sign and return this Agreement (except if you live or work in Minnesota, this Severance Pay shall be paid beginning no sooner than sixteen (16) days after you sign and return this Agreement provided you do not revoke this Agreement pursuant to Paragraph 14 below). For purposes of this Agreement, the period during which you are entitled under the Plan to receive Severance Pay is the "Severance Period."

(b) **Group Benefits and COBRA Subsidy.**

(i) **COBRA Continuation Coverage**. Group medical, dental, vision, and prescription drug coverage in which you are enrolled as of your Separation Date will continue through the end of the calendar month in which your Separation Date occurs. Beginning on the first day of the first calendar month following your Separation Date, you and any covered dependents shall be eligible to elect continued medical, dental, vision, and prescription drug benefits coverage (collectively, "group health coverage") pursuant to the federal Consolidated Omnibus Budget Reconciliation Act ("COBRA"). You are solely responsible for paying the full premium costs (including a 2% administration charge) for such COBRA continuation coverage each month for as long as you remain eligible for and elect to receive COBRA continuation coverage as provided by the COBRA law. If you become eligible for group health coverage under any other group health insurance plan at any time between your Separation Date and the end of the COBRA period, you shall promptly notify the Company, and the Company shall no longer be obligated to provide any group health coverage to you or your dependents. You have a right to COBRA coverage at your sole expense regardless of whether you sign this Agreement.

(ii) **COBRA Subsidy**. To help defray the cost of COBRA continuation coverage during the Severance Period, if you timely sign, return, and do not revoke this Agreement, the Company shall pay you a lump sum payment in the gross amount of One Thousand Eight Hundred Seventeen Dollars and Seventy Six Cents ($1,817.76), which represents the amount the Company would otherwise contribute toward your group health coverage premium as if you were an active employee for a period of time equal to the Severance Period (COBRA Subsidy"). This payment shall be subject to applicable withholding and payroll deductions and shall be paid no sooner than fifteen (15) days after you sign and return this Agreement (except if you live or work in Minnesota, this payment shall be paid no sooner that sixteen (16) days after you sign and return this Agreement provided you do not revoke this Agreement pursuant to Paragraph 14 below).

(c) **Outplacement Assistance.** The Company shall pay the costs of outplacement assistance provided by a third-party outplacement firm, subject to arrangements made by the Company in its sole discretion.

(d) **ICP Bonus.** While you are not entitled to any ICP bonus for 2018, as additional consideration, the Company will pay you a sum to represent a full year ICP bonus for 2018 using a Personal Performance Factor of 1.0 and a Company Performance Factor of 1.0. This bonus payment in the amount of Forty Six Thousand Two Hundred Fifty Dollars and No Cents ($46,250) will be subject to and less all applicable taxes and withholding and shall be paid within the first 30 days in January 2019 after you sign and return this Agreement provided you do not revoke this Agreement pursuant to Paragraph 14 below.

*MAC*

3. **General Release.** (a) In exchange for the Severance Pay, benefits, and other consideration provided in this Agreement, which you would not be entitled to receive apart from this Agreement, you unconditionally release and forever discharge the Company, and its affiliates, parents, subsidiaries, related companies, successors, predecessors, and assigns, and each of its and their respective officers, directors, partners, shareholders, employees, consultants, agents, representatives, and attorneys, past and present, (collectively referenced herein as "Releasees"), from any and all claims, demands, actions, suits, causes of action, obligations, damages and liabilities of any kind, based on any act, omission, occurrence, or nonoccurrence from the beginning of time to the date you sign this Agreement, including but not limited to claims that arise out of or in any way relate to your hiring, employment and/or separation from employment with the Company. You agree that this general release includes but is not limited to: claims for salary, bonuses, compensation, severance pay (except as specified in this Agreement), wages, penalties, premiums, vacation pay, or any benefits under the Employee Retirement Income Security Act of 1974, as amended; claims for breach of implied or express employment contracts or covenants, defamation, wrongful separation, public policy violations, emotional distress and related matters, attorney's fees, discrimination or harassment under federal, state or local laws; and claims based on any federal, state or other statute, regulation or ordinance, including but not limited to Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended by the Older Workers Benefit Protection Act, the Americans With Disabilities Act, the Family and Medical Leave Act, and the Worker Adjustment and Retraining Notification Act. You expressly acknowledge that this Agreement resolves all legal claims you may have against the Company and the Releasees as of the date you sign this Agreement, including but not limited to claims that you did not know or suspect to exist in your favor at the time you sign this Agreement.

Excluded from the general release above are any claims or rights which cannot be waived by law, including but not limited to, claims arising after the date you sign this Agreement and the right to file a charge of discrimination with, or participate in an investigation conducted by, a government agency such as the U.S. Equal Employment Opportunity Commission ("EEOC"). You understand and agree, however, that you are waiving your right to recover money or other relief in connection with such a charge, whether filed by you or any other individual or entity. You and the Company otherwise intend the general release above to be general and comprehensive in nature and to release all claims and potential claims by you to the maximum extent permitted by law.

(b) **State and Local Waivers.** If you work or reside in California, Montana, North Dakota, or South Dakota, you expressly waive the benefit of Section 1542 of the California Civil Code, Montana Code Annotated, Section 28-1-1602, North Dakota Century Code, Section 9-13-02, and South Dakota Codified Laws, Section 20-7-11, respectively, and agree that the general release in this Paragraph 3 covers claims arising prior to the date you sign this Agreement which you do not know or expect to exist in your favor at this time. The cited statutes provide: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

If you work or reside in New Jersey, you expressly waive all claims under the Conscientious Employee Protection Act.

If you work or reside in West Virginia, you expressly waive all claims under the West Virginia Human Rights Act. The toll free number for the West Virginia Bar Association is 1-866-989-8227.

If you work or reside in the District of Columbia, you expressly waive all claims under the District of Columbia Human Rights Act.

If you work or reside in Massachusetts, you expressly waive all claims under the Massachusetts Wage Act (G.L. c. 149, §148 *et seq.*).

4. **Covenant Not to Sue.** You represent and warrant that you have not filed or otherwise initiated any lawsuit, arbitration proceeding, or other action in any forum with any court or entity or forum relating to any claims released by you under this Agreement, and that you shall never file or initiate any such lawsuit, arbitration proceeding or other action in any form or forum relating to any claims released herein. However, this paragraph shall not apply to any claim or action by you to enforce this Agreement. If you violate this paragraph, you shall pay all legal expenses and costs, including reasonable attorney's fees, incurred by any Releasee in defending against your suit. Alternatively, if you violate this paragraph, the Company at its option, may require you to return all monies and other benefits and consideration provided to you under this

Agreement, except for $1,000. In that event, the Company shall be excused from making any further payments, continuing any other benefits, or providing other consideration otherwise owed under this Agreement.

## 5. Restrictive Covenants.

**a. Continuing Obligations.** You acknowledge and re-affirm your continuing obligations under any non-disclosure, confidentiality, intellectual property, non-solicitation and/or noncompetition agreement you previously signed pertaining to the Company's interests, which agreement is hereby incorporated and made a part of this Agreement as Attachment A (if any). Notwithstanding the above, you agree you had access to a variety of trade secret and/or confidential and proprietary information relating to the Company's business, including but not limited to: competitive analyses; product costs; manufacturing costs; pricing information; business forecast information; sales information; profit information; accounting information; tax information; financial information and plans; acquisition and divestiture information and strategies; business strategies; product improvements and strategies; service improvements and strategies; marketing improvements and strategies; sales improvements and strategies; customer information; current product applications; marketing plans and sales plans; technical processes and techniques; administrative information including management organizational information; (all of which information in this Subparagraph 5(b) is collectively referenced as "Confidential Information"). You acknowledge and agree that such Confidential Information is Company property and you shall not, directly or indirectly, use or disclose it for your own or a third party's benefit. Nothing in this Section 5(b) or in this Agreement or in any prior agreement you may have entered into with the Company (including obligations contained in an agreement attached to this Agreement as Attachment A) prohibits you from reporting possible violations of federal or state law or regulation to any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation, nor are you required to notify the Company regarding any such reporting, disclosure or cooperation with the government.

(c) For twelve (12) months after your Separation Date, you agree that you will not, directly or indirectly, attempt to hire, engage the services of, or employ in any manner any person who was an executive, management, sales and marketing, operations, research and development, or employee or independent contractor of the Company or its affiliates in the six (6) months preceding your Separation Date and who possesses or had access to Confidential Information. You agree not to encourage or attempt to persuade any employee or independent contractor of the Company to (i) leave the employment of or terminate a relationship with the Company; (ii) interfere with any such individual's performance of their duties for the Company; or (iii) communicate with any such individuals for the purposes described in this Subparagraph 5(c).

## 6. Return of Company Property. You agree to return to the Company in good working order and no later than your Separation Date all keys, files, records (and copies thereof), equipment (including but not limited to computer hardware, software and printers, wireless handheld devices, cellular phones, SIM cards, external media devices and pagers), Company identification, Company vehicles, Company confidential and proprietary information, and any other Company-owned property in your possession or control. You represent and agree that you have left and will leave intact all electronic Company documents, including, but not limited to any that you developed or helped to develop during your employment. You further represent and warrant that you have returned any and all Company proprietary, trade secret and confidential information, whether in hard copy or electronic form and that you have cancelled any accounts for your benefit in the Company's name, including but not limited to credit cards, telephone charge cards, cellular phone and/or pager accounts.

## 7. Non-Disparagement. You agree that as a condition of the Severance Pay, benefits and other consideration provided in this Agreement, you shall not make any false, disparaging or derogatory statements to any media outlet, industry group, financial institution, current or former employee, consultant, client or customer of the Company or any other entity or third person regarding the Company or any other Releasee about the business affairs or financial condition of the Company or any other Releasee. You understand that the foregoing non-disparagement provision does not apply on occasions when you provide truthful information in good faith to a federal or state governmental agency, entity or official investigating an alleged violation of federal or state law or regulation or when you make other disclosures that are protected under the whistleblower provisions of federal or state law.

## 8. Limitations / Re-employment. Except as set forth in this Agreement, you are not entitled to any other post-termination pay, severance benefits or other consideration. You promise and agree not to seek employment in the future with the Company or any other Releasee. You agree that the Releasees have no obligation to reemploy you or offer you employment

in the future and that you shall have no recourse against any Releasee if that Releasee refuses to employ you or offer you employment. Notwithstanding the foregoing, any Releasee may offer to re-employ you in the future if, in its sole discretion, it chooses to do so. You acknowledge that if you become employed by the Company or any of its subsidiaries or affiliates during the Severance Period, all of the pay, benefits and other consideration provided in Paragraph 2 shall cease, and in the case of equity, any such awards, be governed by the applicable stock plan and award agreement.

9. **On the Job Injury.** You represent that you have no job-related illness or injury for which you have not already filed a claim.

10. **Validity.** Should a court of competent jurisdiction determine that any provision of this Agreement is invalid, that provision shall be severed and the rest of this Agreement shall remain in effect.

11. **Confidential Separation Information.** You agree that as a condition of your receiving Severance Pay, benefits and other consideration under this Agreement, the fact, terms and contents of this Agreement and the contents of all communications resulting in this Agreement shall be kept confidential by you and your agents, representatives and family members, and shall not be disclosed except to the extent required by law or as otherwise agreed to in writing by an authorized representative of the Company.

12. **Consequences of Breach.** You acknowledge the Company's right to enforce the above Paragraphs 5 (Restrictive Covenants), 7 (Non-Disparagement), and 11 (Confidential Separation Information) in any court of competent jurisdiction. You further agree that if you breach any of these provisions, the Company will be irreparably harmed as a matter of law and will be entitled to seek immediate injunctive relief, plus its reasonable attorney's fees incurred in enforcing the provision breached.

13. **Non-Admission of Liability.** You agree that this Agreement does not admit liability or wrongdoing on the part of the Company or any other Releasee.

14. **Acknowledgments.** You acknowledge that you have been given at least fourteen (14) days to consider this Agreement and that, with this Agreement, the Company has advised you in writing to consult an attorney of your choice before signing this Agreement. You further acknowledge that the Company is providing you payments, benefits, and other consideration under this Agreement in reliance on your representations and promises herein, including the general release in Paragraph 3 above. You understand that you may sign this Agreement at any time within the 14-day period, but in no event earlier than your Separation Date. The offer of Severance Pay, benefits, and other consideration set forth in this Agreement will expire when the 14-day period ends, if this Agreement is not accepted and returned by you during that period to Jeffrey Lemons; Kollmorgen Corporation 201 West Rock Road, Radford, VA 24141 email: jeff.lemons@kollmorgen.com; telephone number: 540-633-3520. If you live or work in Minnesota then: (i) you understand that you have the right to revoke this Agreement after signing it by sending written notice of revocation to the Company's representative and at the contact information identified above no later than fifteen (15) days after you sign this Agreement; and (ii) you acknowledge that this Agreement shall not be effective or enforceable until the 15-day revocation period expires.

15. **Knowing and Voluntary Release.** You agree that you are signing this Agreement voluntarily and of your own free will and not because of any threats or duress. You affirm that no promises or agreements of any kind (other than those in this Agreement) have been made to or with you by any person or entity whatsoever that would cause you to sign this Agreement. You have had an opportunity to discuss fully and review the terms of this Agreement with an attorney of your choice. You agree that you have carefully read this Agreement and understand its contents, freely and voluntarily assent to all terms and conditions contained in this Agreement, sign your name of your own free will, and intend to be legally bound by this Agreement.

16. **Cooperation.** During your remaining employment with the Company and after the termination of your employment, with reasonable notice, you agree to cooperate with the Company and to respond to reasonable inquiries and requests for information by the Company in connection with any legal matters in which you are involved or may become involved relating to matters arising during your employment with the Company, including any legal matters in which you may potentially be called as a witness for the Company. Your agreement to cooperate with and to provide responses to such reasonable inquiries and requests for information does not create any employment relationship between you and the Company. The Company agrees to cooperate with you to minimize any disruption to you caused by your cooperation with the Company pursuant to this Paragraph 16.

4

17. **Applicable Law.** This Agreement shall be interpreted under the laws of Virginia without regard to conflict of laws provisions. You hereby irrevocably submit to and recognize the jurisdiction of that state's courts (or if, appropriate, a federal court located in that state) over any suit, action or other proceeding arising out of, under or in connection with this Agreement or any subject addressed in this Agreement. For purposes of this Agreement, you agree that those courts are the only courts of competent jurisdiction.

18. **Entire Agreement.** This Agreement, including any Attachment A, constitutes the entire understanding and agreement between the parties pertaining to subjects addressed in this Agreement and cancels all previous oral and written agreements and commitments connected to those subjects. This Agreement may not be modified in any manner, except by written amendment signed by duly authorized representatives of both parties. This Agreement is binding upon and shall inure to the benefit of the parties and their respective agents, assigns, heirs, executors, successors and administrators.

[*Signature block on following page.*]

BY SIGNING THIS SEPARATION AGREEMENT AND GENERAL RELEASE, YOU REPRESENT AND WARRANT THAT:

    (1) YOU HAVE READ THIS AGREEMENT;
    (2) YOU UNDERSTAND THAT YOU ARE GIVING UP CERTAIN RIGHTS;
    (3) YOU AGREE WITH THE TERMS IN THIS AGREEMENT;
    (4) YOU HAVE BEEN ADVISED TO, AND ARE AWARE OF YOUR RIGHT TO CONSULT AN ATTORNEY OF YOUR CHOOSING BEFORE SIGNING THIS AGREEMENT; AND
    (5) YOU HAVE SIGNED THIS AGREEMENT KNOWINGLY AND VOLUNTARILY.

**ASSOCIATE**

BY: _____
    *(Associate Signature)*

MICHAEL A. CAVALIERI
    *(Associate Printed Name)*

ON: 01/05/20 19
    *(Date)*

**COMPANY**
Kollmorgen Corporation

BY: _____
    *(Signature of Company Official)*

Jeffrey D. Lemons   VP HR
    *(Printed Name and Title of Company Official)*

ON: 1/7/2019
    *(Date)*

A TRUE COPY:
TESTE: Melissa White
DEPUTY CLERK
CIRCUIT COURT, RADFORD, VA.

Salaried – Ind/Group <

6